**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**CIVIL NO. 3:09CV16-RJC-DSC**

| | |
|---|---|
| **DEBBIE P. THOMAS,** ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **MEMORANDUM AND RECOMMENDATION** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social** ) | |
| **Security Administration,** ) | |
| **Defendant.** ) | |
| ) | |

THIS MATTER is before the Court on Plaintiff's "Motion for Summary Judgment" (document #10) and "Memorandum in Support ..." (document #11), both filed September 29, 2009; and Defendant's "Motion for Judgment on the Pleadings" (document #12) and "Memorandum in Support ... (document #13), both filed November 13, 2009. This case has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), and these motions are now ripe for disposition.

Having considered the written arguments, administrative record, and applicable authority, the undersigned respectfully recommends that Plaintiff's Motion for Summary Judgment be denied; that Defendant's Motion for Judgment on the Pleadings be granted; and that the Commissioner's decision be affirmed.

## I. PROCEDURAL HISTORY

On October 19, 2004, Plaintiff filed an application for a period of disability and Disability Insurance Benefits ("DIB") alleging she was unable to work as of November 23, 2000 due to

"dislocated dis. in [her] right shoulder" (Tr. 97).[1]   Plaintiff's claim was denied initially and upon reconsideration.  Plaintiff then requested an administrative hearing (Tr. 52), which was held on November 8, 2007 (Tr. 302-338).

On January 25, 2008, an Administrative Law Judge ("ALJ") issued a decision finding that Plaintiff was not disabled during the relevant period (Tr. 26-41).  The ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date and that Plaintiff suffered from cervical radiculopathy and shoulder impingement which were severe impairments within the meaning of the regulations, but did not meet or equal any listing in 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ also considered Plaintiff's testimony regarding her impairments' severity and resulting functional limitations, but found this testimony not to be entirely credible (Tr. 34).   The ALJ found that Plaintiff retained the Residual Functional Capacity ("RFC")[2] to perform light[3] and sedentary work that does not require frequent or repetitive reaching above shoulder level, frequent

---

[1] In order to qualify for Social Security Disability benefits, an individual must become disabled during the period under which she is insured by the program.  20 C.F.R. § 404.131 (2009).  In the present case, Plaintiff had to establish disability on or before December 31, 2006.  (Tr. 16).

[2] The Social Security Regulations define "Residual Functional Capacity" as "what [a claimant] can still do despite his limitations."  20 C.F.R. § 404.1545(a).  The Commissioner is required to "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b).

[3] "Light" work is defined in 20 C.F.R. § 404.1567(b) as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

climbing/balancing, bending, stooping or exposure to unprotected heights and hazards; and that is unskilled or semiskilled with no sustained skilled concentration (Tr. 32-33). The ALJ concluded that given her functional limitations, Plaintiff was not able to perform her past relevant work. The ALJ then shifted the burden to Defendant to show the existence of other jobs in the national economy which Plaintiff could have performed. The ALJ took testimony from a Vocational Expert ("V.E.") whose testimony was based on a hypothetical that factored in the above limitations. The V.E. testified that Plaintiff could perform work as a receptionist (DOT # 237.367-038, 8.500 jobs in North Carolina and 365,000 jobs nationally), surveillance-system monitor (DOT # 379.367-010, 900 jobs North Carolina and 48,000 jobs nationally), information clerk (DOT # 237.367-022, 1,500 jobs North Carolina and 75,000 jobs nationally), companion (DOT # 309.677-010, 3,300 jobs North Carolina and 165,000 jobs nationally), hostess (DOT # 310.137-010, 11,000 jobs North Carolina and 324,000 jobs nationally), and cashier (DOT # 211.462-010, 10,000 jobs North Carolina and 300,000 jobs nationally) (Tr. 37, see also Tr. 333-335).[4] Accordingly, the ALJ concluded that there was substantial evidence that there were a significant number of jobs in the national economy that Plaintiff could perform and that, therefore, she was not disabled.

Plaintiff timely requested review by the Appeals Council and offered as "new evidence" an October 25, 2007 report prepared by Dr. Michael Getter, one of Plaintiff's treating physicians.

By notice dated December 14, 2008, the Appeals Council denied Plaintiff's request for further administrative review.

Plaintiff filed the present action on January 13, 2009. On appeal, Plaintiff assigns error to

---

[4] Plaintiff correctly points out that the V.E. furnished the wrong DOT numbers for the jobs of surveillance-system monitor and receptionist. Any error, however, was harmless because the jobs in question were ascertainable to the ALJ and counsel. See Fisher v. Barnhart, 181 F. App'x 359, 366 (4th Cir. 2006) (unpublished).

the Appeals Council's decision not to remand for consideration of Dr. Getter's report, to the ALJ's evaluations of her credibility and RFC, and to his alleged failure to resolve "apparent conflicts" between the V.E.'s testimony and the Dictionary of Occupational Titles ("DOT"). See Plaintiff's "Memorandum in Support ..." at 1-2 (document #11). The parties' motions are ripe for disposition.

## II. STANDARD OF REVIEW

The Social Security Act, 42 U.S.C. § 405(g) and § 1383(c)(3), limits this Court's review of a final decision of the Commissioner to: (1) whether substantial evidence supports the Commissioner's decision, Richardson v. Perales, 402 U.S. 389, 390, 401 (1971); and (2) whether the Commissioner applied the correct legal standards. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); see also Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). The District Court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986); King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

As the Social Security Act provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986), quoting Richardson v. Perales, 402 U.S. 389, 401 (1971), the Fourth Circuit defined "substantial evidence" thus:

> Substantial evidence has been defined as being "more than a scintilla and do[ing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

See also Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976) ("We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical

evidence").

The Fourth Circuit has long emphasized that it is not for a reviewing court to weigh the evidence again, nor to substitute its judgment for that of the Commissioner, assuming the Commissioner's final decision is supported by substantial evidence. Hays v. Sullivan, 907 F.2d at 1456 (4th Cir. 1990); see also Smith v. Schweiker, 795 F.2d at 345; and Blalock v. Richardson, 483 F.2d at 775. Indeed, this is true even if the reviewing court disagrees with the outcome – so long as there is "substantial evidence" in the record to support the final decision below. Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

Fourth Circuit precedent dictates that a district court cannot consider evidence which was not presented to the ALJ. Smith v. Chater, 99 F.3d 635, 638 n.5 (4th Cir. 1996), citing United States v. Carlo Bianchi & Co., 373 U.S. 709, 714-715 (1963). Reviewing courts are restricted to the administrative record when determining whether the decision of the ALJ is supported by substantial evidence. Wilkins v. Secretary, Department of Health and Human Services, 953 F.2d 93, 96 (4th Cir. 1991), citing Huckabee v. Richardson, 468 F.2d 1380, 1381 (4th Cir. 1972).

In order for a reviewing court to remand a case to the Commissioner for the consideration of additional evidence, the evidence must be new, material, and there must be good cause for failing to present the evidence earlier. See 42 U.S.C. § 405(g); Wilkins v. Secretary, Department of Health and Human Services, 953 F.2d 93, 95-96 (4th Cir. 1991); and Williams v. Sullivan, 905 F.2d 214, 216 (8th Cir.1990).

For these purposes, evidence is "new" if it is relevant to the determination of disability at the time the application was filed and not merely cumulative or duplicative. Wilkins, 953 F.2d at 96, citing Williams v. Sullivan, 905 F.2d 214, 216 (8th Cir. 1990).

For evidence to be considered "material," it must be shown that there is a reasonable possibility that the additional evidence would have changed the outcome of the decision. Wilkins, 953 F.2d at 96, citing Borders v. Heckler, 777 F.2d 954, 956 (4th Cir. 1985).

Lastly, Plaintiff must exhibit good cause for failing to present the evidence earlier. Melkonyan v. Sullivan, 501 U.S. 89, 100 (1991). While the Fourth Circuit has not made a specific finding as to what constitutes "good cause," other circuits have ruled that, to establish the existence of "good cause," a plaintiff must show that the additional information was not available to him until after the conclusion of the administrative proceedings. See, e.g., Geigle v. Sullivan, 961 F.2d 1395, 1396 (8th Cir. 1992); and Waite v. Bowen, 819 F.2d 1356, 1361-1362 (7th Cir. 1987).

### III. DISCUSSION OF CLAIM

The question before the ALJ was therefore whether the Plaintiff became "disabled" as that term of art is defined for Social Security purposes before the expiration of her insured status on December 31, 2006. [5] It is not enough for a claimant to show that she suffered from severe medical conditions or impairments which later became disabling. Rather, the subject medical conditions must have become disabling prior to the date last insured. Harrah v. Richardson, 446 F.2d 1, 2 (4th Cir. 1971) (no "manifest error in the record of the prior administrative proceedings" where Plaintiff's conditions did not become disabling until after the expiration of his insured status).

Plaintiff argues that the Appeals Council committed reversible error by denying review

---

[5] Under the Social Security Act, 42 U.S.C. §301, et seq., the term "disability" is defined as an:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

Pass v. Chater, 65 F. 3d 1200, 1203 (4th Cir. 1995).

despite new evidence from Dr. Getter, a treating physician (Tr. 22-24). This assignment of error fails for two reasons..

First, the Getter report, dated October 25, 2007 (Tr. 24), cannot be material because it postdates Plaintiff's date last insured (December 31, 2006) by nearly ten months. To prove materiality, a claimant must demonstrate that "there is a reasonable possibility that the new evidence would have changed the outcome." Wilkins, 953 F.2d at 96. The claimant must also show that her disability commenced during a period in which she was entitled to insured status. See 42 U.S.C. § 423(c); 20 C.F.R. §§ 404.101, 404.130-404.131; accord Johnson v. Barnhart, 434 F.3d 650, 655-56 (4th Cir. 2005). Consequently, evidence related to a claimant's condition following expiration of insurance coverage is relevant, and can be material, only to the extent that it sheds light on the claimant's condition while she still enjoyed insured status. Id. In Johnson, on similar relevant facts, the Fourth Circuit upheld an ALJ's rejection of a treating physician RFC form that had been submitted "almost nine months after [the date last insured]" with no suggestion that the form was retrospective in nature. Id. at 656. Accordingly, Plaintiff can not use Dr. Getter's October 25, 2007, assessment to prove that she was disabled as of December 31, 2006.

Moreover, Dr. Getter's October 2007 assessment was equivocal. Although Dr. Getter opined that Plaintiff could lift only ten pounds, both frequently and occasionally, he also opined that Plaintiff had no limitations with respect to standing, walking, and sitting (Tr. 22). Dr. Getter thought that Plaintiff should never climb ladders, but mentioned no other postural limitations (Tr. 23). He checked boxes indicating that Plaintiff's ability to reach, push, and pull was limited by her impairment, but did not elaborate regarding the extent of any such limitations (Tr. 23). He posited that she was able to handle, finger, and feel without any limitation (Tr. 23). He did not find any

environmental restrictions and suggested that she would only miss one day of work per month due to her limitations (Tr. 24). While Dr. Getter's assessment was more restrictive than the ALJ's in terms of lifting weight and whether Plaintiff could ever climb ladders, Dr. Getter identified fewer postural and environmental limitations than the ALJ found. (Compare Tr. 22-24 with Tr. 32-33). The limitations listed by Dr. Getter regarding Plaintiff's ability to reach, push, and pull are not necessarily inconsistent with the ALJ's RFC findings--the ALJ's RFC findings are simply more specific. It is unclear what particular limitations Dr. Getter thought appropriate. See 20 C.F.R. § 404.1527(d)(3) (emphasizing importance of supporting explanation for medical opinion). Accordingly, Dr. Getter's report was not material because it does not contain the sort of information that reasonably could be expected to change the outcome. See Wilkins, 953 F.2d at 96.

Relevant to Plaintiff's second assignment of error, the ALJ properly applied the standard for determining a claimant's Residual Functioning Capacity based on subjective complaints of pain. In this case, the record contains substantial evidence to support the ALJ's conclusion that Plaintiff's testimony was not fully credible. The determination of whether a person is disabled by non-exertional pain or other symptoms is a two-step analysis. "First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996), citing 20 C.F.R. § 416.929(b); and § 404.1529(b); 42 U.S.C. § 423(d)(5)(A). If there is such evidence, then the ALJ must evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [her] ability to work." Id. at 595, citing 20 C.F.R. § 416.929(c)(1); and § 404.1529(c)(1). The regulations provide that this evaluation must take into account:

not only the claimant's statements about his or her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it.

Craig, 76 F.3d at 595 (citations omitted).

Here, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that [her] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible" (Tr. 34). The ALJ proceeded to identify correctly the relevant factors for evaluating subjective complaints (Tr. 33). He then addressed exhaustively all of the relevant factors enumerated in 20 C.F.R. § 404.1529(c)(3) and SSR 96-7p (Tr. 34-35).

With respect to the first factor, daily activities, the ALJ noted that Plaintiff alleged difficulty caring for her personal needs and needing help with housekeeping, laundry, and grocery shopping (Tr. 34). He observed, however, that Plaintiff admitted being able to attend church and visit with neighbors, and emphasized that she had "increased her activity level and lifted some wood" in November 2003; visited Myrtle Beach for three months with her husband; and postponed surgery so that she would not have to wear warm clothes postoperatively (Tr. 34-35). See Johnson, 434 F.3d at 658 ("The ALJ logically reasoned that the ability to engage in [certain daily] activities [was] inconsistent with [the claimant's] statements of excruciating pain and [various alleged limitations]."). With respect to the second factor, the nature of her alleged symptoms, the ALJ duly noted that Plaintiff reported "pain in her right shoulder and arm, and numbness in her hand" (Tr. 34). He also mentioned her complaints of "headaches," throbbing pain, fatigue, dizziness, and poor

memory (Tr. 34). With respect to the third factor, precipitating and aggravating phenomena, the ALJ noted Plaintiff's statements that walking caused her to grow tired and dizzy, that standing led to her neck tightening, that sitting without shifting positions led to neck pain, and that returning to work aggravated her pain (Tr. 34).

As for the fourth factor, the ALJ detailed that Plaintiff has been prescribed pain relievers and muscle relaxants as well as over-the-counter medications (Tr. 34-35). The ALJ specially chronicled Plaintiff's medication-related interaction with her physicians (Tr. 35). Regarding the fifth factor, other treatment, the ALJ noted that Plaintiff used heat and nerve blocks (Tr. 34-35). With respect to the sixth factor, other forms of relief, the ALJ noted that Plaintiff adjusted her posture and avoided strenuous activities (Tr. 34-35). Finally, regarding the seventh factor, other factors, the ALJ mentioned that Plaintiff reported numerous limitations regarding her ability to sit, walk, stand, lift, reach, remember, and focus (Tr. 34-35).

The ALJ emphasized several factors in finding that Plaintiff's subjective complaints were not credible. First, the ALJ correctly found that Plaintiff's allegations were inconsistent with statements made to her treating physicians (Tr. 34). At the hearing, Plaintiff claimed that she had only returned to work for "about a week and a half" following the car accident that purportedly caused her injuries, due to her significant pain (Tr. 311). However, Plaintiff informed her treating physician on March 24, 2000, that she had returned to work on March 23, the day before (Tr. 172); then, on August 14, 2000, Plaintiff's husband informed her physician that she was "having to work" (Tr. 168). During administrative proceedings, Plaintiff averred that she had worked through November 2000 (Tr. 98). Plaintiff's testimony at the hearing unequivocally contradicted her prior statements to both her physicians and the agency.

10

The ALJ also reasonably found that Plaintiff's belated efforts to exaggerate the requirements of her past work undermined her credibility, a finding Plaintiff has not challenged on appeal (Tr. 34-35). During administrative proceedings, Plaintiff professed that she lifted no more than ten pounds at a time while working as a claims adjuster (this involved carrying mail and files) and that the position involved sitting for approximately six hours, walking for one hour, and standing for two hours per day (Tr. 98). At the hearing, however, Plaintiff recalled that at this job she lifted weights between forty and fifty pounds, sat for only two hours per day, and stood or walked for the remainder of the day (Tr. 308-309).

The ALJ likewise reasonably found that Plaintiff failed to comply fully with the advice of her physicians, as chronicled by notes dated June 7, 2000; August 14, 2000; March 6, 2001; October 31, 2002; January 31, 2003; November 26, 2003; March 31, 2004; October 25, 2004; March 13, 2006; and June 5, 2006 (Tr. 35). "The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life." Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994) (citing Hunter v. Sullivan, 993 F.2d 31 (4th Cir. 1992) (claimant's failure to fill prescription for painkiller, which itself was indicated for only mild pain, and failure to follow medical and physical therapy regimen, supported ALJ's inference that claimant's pain was not as severe as he asserted)).

As the ALJ found, on June 7, 2000, Plaintiff voluntarily ceased taking a prescribed medication, but she was instructed to continue the same medication "as needed" (Tr. 170-171). On August 14, 2000, a physician noted that Plaintiff had discontinued medications--Imipramine and Flexeril--that had palliated her head and neck pain, and she was instructed to resume taking the medications (Tr. 168-169). On March 6, 2001, Plaintiff complained to Dr. Getter that Neurontin

and Baclofen had not meliorated her pain after only two weeks. Dr. Getter responded that this was not surprising and that she should continue taking her medications (Tr. 200). The ALJ did not misread the note. Rather, he permissibly concluded that the note suggested Plaintiff's ongoing suspicion of her physicians' recommended treatment.

On October 31, 2002, Plaintiff reported to Dr. Brian Wilder that she was treating her pain with "B.C. Powders," but that she was "worried about this" (Tr. 225). Dr. Wilder prescribed Bextra in place of "B.C. Powders" (Tr. 225). Plaintiff's present protestations notwithstanding, the issue is not whether she was concerned with the side effects of "B.C. Powders"--what matters is that she sua sponte discontinued the prescription medication prescribed by her physician (Tr. 225). Moreover, on January 31, 2003, Plaintiff informed Dr. Wilder that Bextra "was helpful" but that she had "ran out of it and ha[d] not called for a refill" (Tr. 224).

On November 26, 2003, Plaintiff reported that she continued to have pain but that she had increased her "activity level" and "did some lifting of some wood," which resulted in more pain (Tr. 219). She mentioned that only the application of heat reduced her pain (Tr. 219). The ALJ reasonably found this statement inconsistent with statements regarding the palliative effects of her medications, such as Bextra and Zanaflex (Tr. 224, 298).

On March 31, 2004, Plaintiff reported that she still experienced pain but that she had not taken Zanaflex because she was "afraid of it" (Tr. 218). She had not seen Dr. Getter recently because she had been in Myrtle Beach with her husband for the past three months (Tr. 218). Dr. Getter "discussed that issue" with her and instructed her to take her "Zanaflex as ordered previously" (Tr. 218) (emphasis added).

On March 13, 2006, Plaintiff renewed her complaints of pain but revealed that she had been

"on and off taking the Zanaflex," although she stated that medicine was "beneficial." (Tr. 298). Dr. Zachariah Gerger, her physician, noted that Plaintiff had been "reluctant" to permit nerve block injections (Tr. 298). The ALJ appropriately concluded that an individual with the incapacitating pain alleged by Plaintiff would not persistently present new barriers to treatment.

Om June 5, 2006, Plaintiff related that Lyrica, a recently prescribed medication, did not "help," and that Zanaflex, which she took only "occasionally," did not help "very much" (Tr. 299). Plaintiff emphasized that she "just need[ed] surgery" (Tr. 299).

Yet on January 29, 2007, Plaintiff postponed her planned shoulder surgery with Dr. Getter "yet again" because she "want[ed] to wait until the warmer [weather] so that she [would not] have to dress warm[ly] postoperatively" (Tr. 264). She was not even certain that she wanted the surgery any more (Tr. 264). Later, on August 20, 2007, Plaintiff was only "close to wanting to have surgery done" (Tr. 265). The ALJ properly identified this conduct as part of Plaintiff's pattern of ignoring the advice of her physicians.

The ALJ also relied upon Dr. Getter's opinions that were rendered during the relevant period (Tr. 36, see also Tr. 199, 262). See 20 C.F.R. § 404.1527(d), 404.1529. On April 4, 2001, Dr. Getter assigned Plaintiff a "7% partial permanent disability for this neck injury that she sustained from this automobile accident" (Tr. 199). Subsequently, on October 19, 2006 (approximately two months before Plaintiff's date last insured), Dr. Getter felt "a little uncomfortable signing [Plaintiff's] permanent disability [form] as he only ha[d] her on a 7% partial permanent disability and he also [wanted] to talk to her concerning all the options for her neck" (Tr. 262). The ALJ reasonably found that such minimal disability ratings suggested a level of limitation less severe than that alleged by Plaintiff. See Smith v. Astrue, C/A No. 3:07-CV-1674, 2008 WL 4414297, at *10

(D.S.C. Sept. 23, 2008) (collecting cases).

In sum, the ALJ articulated numerous, legitimate reasons in finding that Plaintiff was not credible and that her subjective complaints of pain were overstated. The ALJ reasonably concluded that Plaintiff's undeniable misrepresentations detracted from her credibility and, moreover, that her behavior was inconsistent with that of a person suffering from incapacitating pain. See Johnson, 434 F.3d at 658-59.

Plaintiff also contends more broadly that the ALJ erred by failing to evaluate her RFC on a function-by-function basis, as required by SSR 96-8p, Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184 (July 2, 1996).

In relevant part, SSR 96-8p requires that an ALJ engage in a "function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities" in determining the claimant's RFC. SSR 96-8p, 1996 WL 374184, at *3. With respect to step four, RFC may not simply be "expressed initially in terms of the exertional categories of 'sedentary,' 'light,' 'medium,' 'heavy,' and 'very heavy'" because the proper inquiry focuses on the specific demands of the claimant's past work. Id. At step five, however, an ALJ may express RFC in terms of broad exertional categories, but should still "assess the individual's capacity to perform [various exertional and nonexertional] functions in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level." Id. In rendering a decision, an ALJ should explain "how the evidence supports each conclusion," citing both medical and nonmedical evidence. Id. at *7. Moreover, the ALJ should ensure that the RFC reflects an individual's "ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis." Id.

14

Here, the ALJ engaged in a detailed analysis in determining the RFC (Tr. 32-36). The ALJ did not simply state that Plaintiff could perform a particular exertional category of work. Rather, he specifically enumerated additional limitations with respect to Plaintiff's ability to engage in "frequent or repetitive reaching above shoulder level"; "frequent climbing/balancing"; frequent "bending/stooping"; and frequent "exposure to unprotected heights and hazards" (Tr. 32-33). Although Plaintiff did not allege a mental impairment, the ALJ conscientiously added that Plaintiff could only perform work that was "unskilled or semiskilled with no sustained[,] skilled concentration," due to possible limitations stemming from pain and medicinal side effects (Tr. 33). He traced the origins of her physical limitations, stating: "I find that the claimant's cervical radiculopathy, shoulder impingement and associated symptoms of pain prevent her from frequent and repetitive reaching above the shoulder level, occasionally lifting more than 20 pounds, frequent climbing, balancing or stooping" (Tr. 33). Later, the ALJ squarely addressed the opinion of the state-agency evaluator and the state-agency physician, Dr. Joel Dascal (Tr. 36, 43, 206-213, 258), and imposed "additional limitations" beyond those suggested by the state agency (Tr. 36). The ALJ proceeded to examine the specific demands of light work (Tr. 36 citing 20 C.F.R. § 404.1567(a); SSR 83-10, Determining Capability to Do Other Work 1983 WL 31251 (1983)). The ALJ then rejected Plaintiff's allegations that she had difficulty sitting and gripping as unsupported by the evidence (Tr. 36). Meanwhile, the ALJ explicitly recognized that an RFC must encompass an individual's "ability to do physical and mental work activities on a sustained basis despite limitations from her impairments" (Tr. 30).

Finally, Plaintiff asserts that the ALJ erred when he did not question the V.E. as to whether there was any conflict between his testimony and the Dictionary of Occupational Titles ("DOT")

concerning the functional requirements of the jobs he testified that Plaintiff could perform. Social Security Ruling 00-4p sets forth standards for the use of vocational experts. The Ruling contains specific provisions regarding conflicts as follows:

> Occupational evidence provided by a vocational expert or VS generally should be consistent with the occupational information supplied by the *DOT*. When there is an apparent unresolved conflict between vocational expert or VS evidence and the *DOT*, the adjudicator must elicit a reasonable explanation for the conflict before relying on the vocational expert or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

Social Security Ruling 00-4p, *4-5 (emphasis added). The Ruling continues:

> **The Responsibility To Ask About Conflicts**
>
> When a vocational expert or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that vocational expert or VS evidence and information provided in the *DOT*. In these situations, the adjudicator will:
>
> Ask the vocational expert or VS if the evidence he or she has provided conflicts with information provided in the *DOT*; and
>
> If the vocational expert's or VS's evidence appears to conflict with the *DOT*, the adjudicator will obtain a reasonable explanation for the apparent conflict.
>
> **Explaining the Resolution**
>
> When vocational evidence provided by a vocational expert or VS is not consistent with information in the *DOT*, the adjudicator must resolve this conflict before relying on the vocational expert or VS evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

Social Security Ruling 00-4p, *8-9.

In her brief, Plaintiff asserts the existence of several conflicts between the V.E.'s testimony about jobs she could perform and the descriptions of those jobs in the DOT. However, during the

hearing Plaintiff did not argue the existence of apparent conflicts between the V.E.'s testimony and

the <u>DOT</u> as to any of the jobs identified by the V.E.   As the Tenth Circuit Court of Appeals has

held:

> [t]o the extent that there is any implied or indirect conflict between the vocational
> expert's testimony and the DOT in this case, ... the ALJ may rely upon the
> vocational expert's testimony provided that the record reflects an adequate basis for
> doing so .... [A]ll kinds of implicit conflicts are possible and the categorical
> requirements listed in the DOT do not and cannot satisfactorily answer every such
> situation. <u>Moreover, claimants should not be permitted to scan the record for
> implied or unexplained conflicts between the specific testimony of an expert witness
> and the voluminous provisions of the DOT, and then present that conflict as
> reversible error, when the conflict was not deemed sufficient to merit adversarial
> development in the administrative hearing.</u> Adopting a middle ground approach, in
> which neither the DOT nor the vocational expert testimony is per se controlling,
> permits a more straightforward approach to the pertinent issue, which is whether
> there is substantial evidence supporting the Commissioner's determination that this
> particular person can do this particular job or group of jobs.

<u>Gibbons v. Barnhart</u>, 85 Fed.Appx. 88 (10th Cir. 2003) (emphasis added) (quoting <u>Carey v. Apfel</u>,

230 F.3d 131, 146-47 (5th Cir. 2000).   <u>See also</u>  <u>Ketelboeter v. Astrue</u>, 550 F.3d 620, 625 (7th Cir.

2008) (where "[t]he ALJ erred by failing to ask the vocational expert if his testimony conflicted

with the DOT. . . his error is harmless . . . [because] the DOT's descriptions of the jobs that the

vocational expert discussed do not conflict with the hypothetical limitations given by the ALJ.");

<u>Renfrow v. Astrue</u>, 496 F.3d 918, 921 (8th Cir. 2007) ("[T]he ALJ's error in failing to ask the

vocational expert about possible conflicts between his testimony and the *Dictionary of*

*Occupational Titles* was harmless, since no such conflict appears to exist."); <u>Adams v. Astrue</u>, 2007

WL 4358344, *5 (W.D.Va., Dec. 12, 2007) (finding remand for failure to apply SSR 00-4p

inappropriate when little to no conflict existed between the <u>DOT</u> and most of the jobs identified by

the <u>DOT</u>).

Plaintiff protests that the V.E. testified that the surveillance-system monitor job was in the private sphere, while the DOT categorizes it as government service, citing to page 335 of the transcript in an effort to prove the conflict. However, that page contains no indication that the V.E. considered the surveillance-system monitor job to involve private employers vs. the government (Tr. 335). Even if the Plaintiff was factually correct, it is difficult to discern how any variance would be material. The inquiry is whether a claimant can perform the work associated with a job, and not whether a government entity or private company is the employer. Courts have rejected similar challenges in the past. See Shinaberry v. Comm'r of Soc. Sec. Admin, 535 F. Supp. 2d 604, 639 (N.D.W. Va. 2008) (rejecting argument premised upon DOT's categorization of surveillance-system monitor job as public because DOT industry designations are not determinative) (citing Quesenberry v. Astrue, No. 1:06cv00116, 2007 WL 2965042 (W.D. Va. Oct. 10, 2007) (unpublished); Wilcox v. Barnhart, No. Civ. 03-408-PB, 2004 WL 1733447 (D.N.H. July 28, 2004) (unpublished)); accord Haskins v. Comm'r of Soc. Sec., Civ. No. 5:05-CV-292, 2008 WL 5113781, at *15 (N.D.N.Y. Nov. 25, 2008) (unpublished) (rejecting challenge based on DOT's categorization of surveillance-system monitor job as government-oriented when V.E. apparently included private-sphere jobs in calculation of number of jobs); Tucker v. Apfel, No. Civ. A. 99-0309-AH-S, 2000 WL 548178, at *2 n. 1 (S.D. Ala. Apr. 12, 2000) (unpublished) (rejecting materiality of similar challenge). Meanwhile, the V.E. affirmatively stated that the surveillance-system monitor job was performed the same way as when the job was originally included in the DOT, eliminating whatever minimal ambiguity may otherwise have existed (Tr. 335).

Plaintiff also points out that the V.E. acknowledged differences between his understanding of the work of a "hostess" and the DOT job description (Tr. 335). While true, at most this means

that the ALJ should not have relied upon this single job in finding that Plaintiff could work. The V.E.'s testimony regarding the remaining occupations – thousands of which existed in the North Carolina and national economies--supports the ALJ's finding that Plaintiff could perform the work associated with jobs existing in significant numbers in the national economy (Tr. 333-334). See Hicks v. Califano, 600 F.2d 1048, 1051 (4th Cir. 1979) (indicating that as few as 110 jobs constitutes a significant number).

Next, Plaintiff complains that the positions of companion, hostess, and cashier all involve "frequent" reaching. The V.E.'s testimony establishes, however, that the three jobs in question do not involve the specific type of reaching prohibited by Plaintiff's RFC: "frequent or repetitive reaching above shoulder level" with Plaintiff's "dominant right upper extremity" (Tr. 333-334) (emphasis added). The DOT does not state that the jobs in question require frequent reaching in all directions with both arms. Rather, the DOT broadly indicates that these jobs require "frequent" reaching, without more. The DOT's lack of specificity in this regard was properly supplemented by the testimony of the V.E., as is contemplated by the regulations. See 20 C.F.R. § 404.1566(d).

In short, any technical failure of the ALJ to inquire as to whether there were conflicts between the V.E.'s testimony and the DOT was harmless. Sanders, 129 S. Ct. at 1706.

Plaintiff concludes her brief with the conclusory assertion that the ALJ abrogated his duty to reach a decision free from unsupported "presumptions, speculations, and suppositions." Document #11 at 24-25, citing SSR 82-56, The Sequential Evaluation Process, 1982 WL 31377; SSR 86-8, The Sequential Evaluation Process, 1986 WL 68636 (1986)).[6] The relevant paragraph of SSR 86-8 states:

---

[6] SSR 82-56 has been superseded by SSR 86-8.

The disability determination or hearing decision must be set forth carefully. The rationale must reflect the sequential evaluation process; describe the weight attributed to the pertinent medical, nonmedical and vocational factors in the case; and reconcile any significant inconsistencies. <u>Reasonable inferences may be drawn</u>, but presumptions, speculations and suppositions should not be substituted for evidence.

SSR 86-8, 1986 WL 68636, at *8 (emphasis added). Plaintiff has not cited and the Court is unaware of any authority reversing a final decision of the Commissioner on the basis of an SSR 86-8 challenge apart from a more concrete, substantive challenge. As discussed above, Plaintiff's substantive assignments of error are meritless, and, consequently, to the extent that her parting shot even rises to the level of an assignment of error, it fails as well.

Although the medical records establish that the Plaintiff experienced pain and mental and emotional difficulties to some extent, as the Fourth Circuit has noted, it is the ALJ's responsibility, not the Court's, "to reconcile inconsistencies in the medical evidence." <u>Seacrist</u>, 538 F.2d at 1056-57.

Simply put, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the Secretary's designate, the ALJ)." <u>Mickles</u>, 29 F.3d at 923, <u>citing</u> <u>Simmons v. Bowen</u>, 834 F.2d 635, 640 (7th Cir. 1987). This is precisely such a case, as it contains substantial evidence to support the ALJ's treatment of the record and the hearing testimony, and his ultimate determination that the Plaintiff was not disabled.

## IV. <u>RECOMMENDATIONS</u>

**FOR THE FOREGOING REASONS,** the undersigned respectfully recommends that Plaintiff's "Motion for Summary Judgment" (document #10) be **DENIED;** that Defendant's

"Motion for Judgment on the Pleadings" (document #12) be **GRANTED**; and that the Commissioner's determination be **AFFIRMED.**

## V.  <u>NOTICE OF APPEAL RIGHTS</u>

The parties are hereby advised that, pursuant to 28 U.S.C. §636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same. <u>Page v. Lee</u>, 337 F.3d 411, 416 n.3 (4th Cir. 2003); <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1365 (4th Cir. 1989); <u>United States v. Rice</u>, 741 F. Supp. 101, 102 (W.D.N.C. 1990).   Failure to file objections to this Memorandum with the District Court constitutes a waiver of the right to <u>de novo</u> review by the District Court. <u>Diamond v. Colonial Life</u>, 416 F.3d 310, 315-16 (4th Cir. 2005); <u>Wells v. Shriners Hosp.</u>, 109 F.3d 198, 201 (4th Cir. 1997); <u>Snyder</u>, 889 F.2d at 1365.   Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal. <u>Diamond</u>, 416 F.3d at 316; <u>Wells</u>, 109 F.3d at 201; <u>Page</u>, 337 F.3d at 416 n.3; <u>Thomas v. Arn</u>, 474 U.S. 140, 147 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 845-46 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties; <u>and to the Honorable Robert J. Conrad, Jr.</u>

**SO RECOMMENDED AND ORDERED**.

Signed: November 17, 2009

David S. Cayer
United States Magistrate Judge